UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,   **REPORT AND RECOMMENDATION**

v.

18-CR-00081(EAW)(JJM)

DANIEL HUNT,

                    Defendant.
_____

        Defendant Daniel Hunt is charged in a two-count Superseding Indictment [9] [1] with possession of a firearm and ammunition by a felon, in violation of 18 U.S.C. §§922(g)(1) and 924(a)(2), and with possession of a stolen firearm, in violation of 18 U.S.C. §§922(j) and 924(a)(2). Both counts arise from a September 21, 2017 traffic stop of Hunt's vehicle. Before the court is Hunt's supplemental motion to suppress evidence arising from that traffic stop. Anzalone Affirmation [41], §VII. [2]

        A hearing to address the motion was held before me on July 25, 2019 [65], at which City of Lockport Police Department Lieutenant Steven Tarnowski testified. Having reviewed the parties' post-hearing submissions [66-68] and heard oral argument on November 5, 2019 [69], for the following reasons, I recommend that the motion be granted.

---

[1]     Bracketed references are to CM/ECF docket entries. Unless otherwise indicated, page references are to numbers reflected on the documents themselves rather than to the CM/ECF pagination.

[2]     Based on the government's representation that Hunt gave no pre-<u>Miranda</u> statements concerning the possession of firearms and that it will produce the first page of the Arrest Report, Hunt agreed that all portions of his pretrial motions [21, 41], other than his motion to suppress evidence, were resolved. June 3, 2019 Text Order [51].

## BACKGROUND

While patrolling in his vehicle with Officer Uhteg,[3] a trainee, on September 21, 2017 at approximately 5:00 p.m., Lieutenant Tarnowski received a call from the 911 dispatcher reporting a non-emergency civilian complaint of a male kicking garbage into the Erie Canal at Upson Park in the City of Lockport. Hearing Transcript [65], pp. 7-11, 92. The suspect was reported to be with a black Chevy truck with a ladder rack that was occupied by two males and two females. Id., pp. 9-10; gov. ex. 2 (audio recording of the civilian's two telephone calls to the 911 dispatcher). Within minutes of receiving that call, Lieutenant Tarnowski arrived at Upson Park, and observed an individual on a cellphone pointing northeast toward Clinton Street "in the direction of a cloud of dust saying he went that way". [65], pp. 12, 93.

Within seconds of traveling on Clinton Street, Lieutenant Tarnowski observed the suspect vehicle, which was approximately two to three blocks from Upson Park. Id., pp. 13-15, 101-02. At that point, he activated the emergency lights and conducted a traffic stop of the vehicle. Id., pp. 20-21, 102. Lieutenant Tarnowski approached the passenger side of the vehicle and observed Hunt, the driver, and three passengers - Christopher Fitzgerald (front passenger), and two females (rear passengers). Id., pp. 21-22. He interviewed the occupants to ensure that he had the correct vehicle. Id., p. 22. During the course of Lieutenant Tarnowski's questioning, Fitzgerald admitted throwing trash into the Canal. Id., p. 23.

At some point, Officer Uhteg, who was on the driver's side of the vehicle, informed Lieutenant Tarnowski that Hunt may be intoxicated, and that was confirmed by Lieutenant Tarnowski. Id., pp. 21, 25-27. After Hunt failed several field sobriety tests, he was arrested for driving while intoxicated, handcuffed and placed in the rear of Lieutenant

---

[3]    Officer Uhteg's first name does not appear in the record.

Tarnowski's patrol vehicle. Id., pp. 28-34, 36-38, 45, 106.  Following Hunt's arrest, it was Lieutenant Tarnowski's intention to tow the vehicle, which he determined was owned by Hunt. Id., pp. 47, 78.  The three passengers were removed from Hunt's vehicle and searched.  No weapons or contraband were found in the women's purses. Id., pp. 108-14, 132.

        The video from the body cameras worn by Officer Szwartz[4] (def. ex. I, 11:30-11:50),[5] another officer who arrived at the scene, and Officer Uhteg (gov. ex. 3, 10:36-12:00)[6] depict Lieutenant Tarnowski stating that a "grinder" was discovered near Fitzgerald's feet as he was removed from the vehicle.[7]  Fitzgerald was handcuffed and placed in the rear of Officer Szwartz's vehicle (gov. ex. 3, 12:00-12:55) while the two female occupants were told that they were being detained at the scene because drugs were recovered from the vehicle, and no one was taking responsibility for it. Gov. ex. 3, 14:38-14:45, 16:00-16:45.

        After everyone was out of Hunt's vehicle, Lieutenant Tarnowski decided to conduct an inventory search. [65], pp. 115-16.  Lieutenant Tarnowski testified that he followed the Lockport Police Department Inventory and Tow Impound Policy ("Department Policy") in conducting that search. Id., pp. 48-57; gov. ex. 5 [60-2].  According to Lieutenant Tarnowski, the search occurred in two parts:  the initial search conducted by him and Officer Uhteg, and the second search by Officer Szwartz. [65], pp. 65-66.  Lieutenant Tarnowski explained that "we complete the search, and it's documented by the backup officer [Officer Szwartz].  He's not going through the car again.  We'll say this was found . . . . He'll look from the outside of the

---

[4]      Officer Szwartz's first name does not appear in the record.

[5]      These are citations to the elapsed time on the video player.  Each video begins at 0:00.

[6]      Lieutenant Tarnowski was not equipped with a body camera. [65], pp. 28-29.

[7]      A grinder is "a small cylindrical object used to grind marijuana buds into a finer material for smoking". United States v. Campbell, 790 F. Supp. 2d 166, 170 n. 3 (D. Vt. 2011).

vehicle, but he's not searching the car for further evidence . . . . He's just mainly documenting what the first search found . . . . He's not looking through glove boxes. He's not looking under floor mats". Id., p. 67. Lieutenant Tarnowski testified that he was not present for the entirety of that portion of the search, and was only present when Officer Szwartz completed the beginning of the Motor Vehicle Tow Report, which contained the inventory of items. Id., pp. 65- 68; gov ex. 6 [60-3].

However, the video from the body camera worn by Officer Szwartz belies Lieutenant Tarnowski's description of how the inventory search was conducted. It depicts Lieutenant Tarnowski and Officer Szwartz rummaging through Hunt's vehicle. Def. ex. I (19:45-28:00). It does not show Officer Uhteg participating in the search. In fact, on the video from Officer Uhteg's body camera, he states in response to a question from Fitzgerald that, "I did not search the vehicle". Gov. ex. 3, 31:55.[8]

During the inventory search, the subject firearm was recovered from inside the vehicle. [65], pp. 71, 80-82; gov. ex. 4 [60-1]. Although the firearm was documented by Lieutenant Tarnowski in the arrest report, it was not included in the inventory report prepared by Officer Szwartz. [65], pp. 72, 81, 127, 134; gov. ex. 6 [60-3]. Lieutenant Tarnowski acknowledged that the firearm was an item of significance that must be included on the inventory report. [65], p. 127.

While Lieutenant Tarnowski agreed that searching a vehicle for contraband was not a valid exercise of the Department's Policy, he acknowledged stating minutes into the search of Hunt's vehicle that "there's definitely something in here, the way there're all acting". Id., pp. 118-20, 124, 133. When asked whether he was searching for something, he testified "[m]aybe

---

[8]   All quotations from the body camera videos are unofficial chambers transcriptions.

after I got into the vehicle.  Initially, that's not the reason for the search. Once you're inside the vehicle, obviously there can be things inside that might point you one way or another, odors, shake, which would be small bits of green leafy vegetable matter on the ground.  Many things can trigger suspicion." Id., p. 119.

At the conclusion of the search, the female occupants were permitted to leave. Gov. ex. 3, 27:37.  As they were leaving, Hunt appeared to yell to them to take his truck, but Lieutenant Tarnowski stated, "no I'm towing it, I cannot let anyone take it.  It's a DWI, it's required by law that I tow it". Id., 27:50-28:00.   Hunt was then told that a "little bit" of marijuana was recovered from his vehicle - a blunt on his side and a grinder on the passenger side.  Hunt took responsibility for both items. Id., 28:00-28:20. At that point, Fitzgerald was released on an appearance ticket for violating Lockport's City Ordinance (§115(3)), which Lieutenant Tarnowski testified was a "violation-level offense". Id., 30:35-30:50; [65], pp. 22-23, 103.

## DISCUSSION

In seeking suppression, Hunt challenges the legality of the traffic stop and warrantless search of his vehicle. The government disputes those arguments, and alternatively contends that even if there was a Fourth Amendment violation, the evidence seized from the vehicle remains admissible pursuant to the inevitable discovery doctrine.

**A.     The Traffic Stop**

"[T]raffic stops must satisfy the Fourth Amendment's reasonableness limitation, which requires that an officer making a traffic stop have . . .  reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in

criminal activity." United States v. Wallace, 937 F.3d 130, 137 (2d Cir. 2019). *See also* Navarette v. California, 572 U.S. 393, 396 (2014) ("[t]he Fourth Amendment permits . . . traffic stop[s] . . . when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity").  "The Government bears the burden of proving, by a preponderance of the evidence, that reasonable suspicion existed for a stop." United States v. Gomez, 199 F. Supp. 3d 728, 741 (S.D.N.Y. 2016), aff'd, 751 Fed. App'x 63 (2d Cir. 2018) (Summary Order).

In attempting to meet that burden, the government argues that "observations made by the officers after pulling the defendant over confirmed his intoxication".  Government's Post-Hearing Memorandum of Law [67], p. 9. However, as Hunt points out, "[a]fter-the-fact observations cannot provide a legal basis for an already-initiated traffic stop" (Hunt's Reply [68], p. 2 n. 2), and Lieutenant Tarnowski did not testify that he made any observations prior to the stop that suggested that Hunt was driving while intoxicated. *See* United States v. Freeman, 735 F.3d 92, 96 (2d Cir. 2013) ("[a]ny events that occur after a stop is effectuated cannot contribute to the analysis of whether there was reasonable suspicion to warrant the stop in the first instance").

The government also argues that committing "a violation of Lockport City Ordinance 115, sub 3, a summonsable offense" gave law enforcement "reasonable suspicion to believe that a crime had been committed".  Government's Post-Hearing Memorandum of Law [67], p. 9.  In response, Hunt argues that at the initiation of the traffic stop, Lieutenant Tarnowski "lacked the requisite reasonable suspicion to believe that [he] (or any of the vehicle's occupants) had 'committed a traffic violation' or was 'engaged in criminal activity.'" Hunt's Post-Hearing Brief [66], p. 7 (*quoting* Holeman v. City of New London, 425 F.3d 184, 189 (2d Cir. 2005)).

The justification for the stop - the report of an individual in the vehicle kicking trash into the canal - was a non-criminal violation. Id.  As he notes, a "violation" is not considered a "crime" under the New York Penal Law. *See* N.Y. Penal Law §10.00(6) ("'[c]rime' means a misdemeanor or a felony").

Since the government does not address (much less refute) that argument, it has failed to demonstrate the existence of reasonable suspicion for the traffic stop. Therefore, I recommend that Hunt's motion to suppress be granted.  *See* United States v. Arias, 2010 WL 2593933, *3 (W.D.N.Y. 2010) ("[e]vidence obtained as the result of an unjustified traffic stop 'is subject to the fruit of the poisonous tree doctrine and may be suppressed'").

In any event, even if the stop of Hunt's vehicle was lawful, for the reasons discussed below, I conclude that the subsequent warrantless search of Hunt's vehicle was conducted in violation of the Fourth Amendment, and that the government has not established the applicability of the inevitable discovery doctrine.

**B.      Inventory Search of the Vehicle**

It is the government's burden to prove by a preponderance of the credible evidence that the warrantless search of Hunt's vehicle was within one of the exceptions to the warrant requirement of the Fourth Amendment. *See* United States v. Perea, 986 F.2d 633, 639 (2d Cir. 1993); United States v. Conception, 1986 WL 6830, *3 (E.D.N.Y. 1986).  Here, the government relies solely upon the inventory search exception to the warrant requirement. Government's Post-Hearing Memorandum of Law [67], p. 13.[9]

---

[9]    Although Hunt addresses other exceptions to the warrant requirement (*e.g.*, the automobile exception and search incident to arrest doctrine), neither are relied upon by the government.  Hunt's Post-Hearing Brief [66], pp. 10-12.

Inventory searches "serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger". Colorado v. Bertine, 479 U.S. 367, 372 (1987). "Because of the danger to privacy interests posed by allowing police officers to conduct warrantless searches, the Supreme Court has required that inventory searches be performed using 'standardized criteria or established routine'". United States v. Williams, 930 F.3d 44, 54 (2d Cir. 2019) (*quoting* Florida v. Wells, 495 U.S. 1, 4 (1990)). *See also* Conception, 1986 WL 6830, *3 (E.D.N.Y. 1986) ("in order to prevent impoundment and inventory from becoming a convenient bypass around the fourth amendment, the reasonableness of each search must be strictly reviewed").

"[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence". Wells, 495 U.S. at 4. Although "[t]he fruit of inventory searches . . . will be suppressed when the searching agents act in bad faith or solely for the purpose of investigation", United States v. Thompson, 29 F.3d 62, 65 (2d Cir. 1994), an inventory search conducted under standardized procedures is not invalidated merely because of "a police expectation that the search will reveal criminal evidence". United States v. Lopez, 547 F.3d 364, 372 (2d Cir. 2008).

The wide-ranging targeted search depicted in the body camera video of Officer Szwartz (def. ex. I) does not resemble an inventory search conducted under a standardized procedure. Notably, Officer Szwartz was not writing anything down as he and Lieutenant Tarnowski rummaged through the car. Extending well beyond what was necessary to record the contents of the vehicle, Officer Szwartz attempted to pull apart a plastic interior body panel (def. ex. I, 21:30-21:40; 24:20-24:30), he and Lieutenant Tarnowski repeatedly looked for a suspected secreted compartment in the center console (id., 21:10-21:50; 23:50-24:20), and Officer Szwartz

attempted to look under the steering wheel cover for contraband based on what he had observed on the television show, Live P.D. (id., 23:25-23:41). *See* United States v. Lugo, 978 F.2d 631, 637 (10th Cir. 1992) ("searching behind the door panel of a vehicle does not qualify as 'standard police procedure,' and does not serve the purpose of 'protecting the car and its contents' under any normal construction of those terms"). When coupled with the statements of Lieutenant Tarnowski that "there's definitely something in here" (def. ex. I, 19:53) and "there's gotta be something in here" (id., 23:21), there can be little doubt that the officers' conduct was geared solely toward locating incriminating evidence, rather than producing an inventory.

The officers' deviation from the Department's Policy further reveals the impermissible purpose of the search. For example, that Policy states that "vehicle inventories will be *thorough and detailed* with *all* items appropriately documented on the 'Motor Vehicle Tow Report' form". Gov. ex. 5 [60-2], §III(B)(3) (emphasis added). Yet, the Motor Vehicle Tow Report falls well short of that standard, stating merely states that the vehicle contained "various tools, cigars, ladder, tools in p.u. bed". Gov. ex. 6 [60-3]. In any event, even assuming that a general description of categories of items can be deemed to be "thorough and detailed", the inventory fails to mention the rifle. While the government argues that "'empty candy wrappers and wads of chewed gum' need [not] be listed separately" on the inventory (government's Post-Hearing Memorandum of Law [67], p. 13, *quoting* Lopez, 547 F.3d at 371), Hunt points out that "there is quite a bit of daylight between 'candy wrappers' and a firearm". Hunt's Post-Hearing Reply Brief [68], p. 3.

Though the government points to the Department's Policy (gov. ex. 5 [60-2]) as permitting "thorough[ ]" inventory searches (government's Post-Hearing Memorandum of Law [67], p. 12), it also expressly states that "[a]n examination of the contents of a motor vehicle

-9-

pursuant to a criminal investigation or with the intent to search for evidence is NOT an inventory" (gov. ex. 5 [60-2], §III(B)(4) (emphasis in original)). Therefore, I conclude that the warrantless search of Hunt's vehicle was not a permissible inventory search.

C.     **Inevitable Discovery**

"The exclusionary rule is not without exceptions". United States v. Stokes, 733 F.3d 438, 444 (2d Cir. 2013).  One such exception is the inevitable discovery doctrine, which provides that "evidence that was illegally obtained will not be suppressed 'if the government can prove that the evidence would have been obtained inevitably' even if there had been no statutory or constitutional violation." United States v. Mendez, 315 F.3d 132, 137 (2d Cir. 2002).

Where the government relies on the doctrine of inevitable discovery on the basis of inventory search procedures, it must establish by a preponderance of the evidence "(1) that the police had legitimate custody of the vehicle or other property being searched, so that an inventory search would have been justified"; "(2) that when the police in the police agency in question conducted inventory searches, they did so pursuant to established or standardized procedures"; and "(3) that those inventory procedures would have inevitably led to the discovery of the challenged evidence." Id. at 138; Nix v. Williams, 467 U.S. 431, 444 (1984).

"[T]he doctrine is available only where there is a high level of confidence that each of the contingencies required for the discovery of the disputed evidence would in fact have occurred." United States v. Heath, 455 F.3d 52, 55 (2d Cir. 2006). "[P]roof of inevitable discovery 'involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment' . . . . The focus on demonstrated historical facts keeps speculation to a minimum, by requiring the district court to determine, viewing affairs as they

-10-

existed at the instant before the unlawful search occurred, what would have happened had the unlawful search never occurred." Stokes, 733 F.3d at 444.

The government argues that "with probable cause to arrest the driver of the car, it was clear that the car would eventually be impounded regardless of what happed next", and that consistent with the Department's Policy, the vehicle would have been inventoried and the firearm ultimately discovered during a valid inventory search. Government's Post-Hearing Memorandum of Law [67], pp. 11-13.[10]  In response, Hunt challenges the government's ability to meet the second and third elements of the doctrine. Again, the government offers no response to the specific arguments raised by Hunt.

First, Hunt relies on the impermissible inventory search conducted to argue that it is "speculative" and "counterfactual" to believe that any subsequent inventory search would have abided by the Department's Policy.  Hunt's Post-Hearing Brief [66], p. 18.  In Mendez, the Second Circuit held that even if the police officers' initial search of the defendant's automobile at time of his arrest was not a valid inventory search, the evidence recovered from the glove compartment of the vehicle would have been inevitably discovered during the subsequent "proper inventory search" that occurred. 315 F.3d at 138-39.  By contrast, here there was no subsequent inventory search.

The second element of the inevitable discovery doctrine is clear - when the Department "conducted inventory searches, they did so pursuant to established or standardized procedures".  Mendez, 315 F.3d at 138.  Given the invalid inventory search that did occur, and in the absence of any competing arguments by the government, I cannot conclude with a high level

---

[10]  Although the government's inevitable discovery argument is not entirely clear to me, this is how Hunt interpreted its argument and the government did not object to that interpretation.  *See* Hunt's Reply [68], p.4.

of confidence that when inventory searches were conducted by the Department, they were completed pursuant to the Department's Policy.

Challenging the third element of the doctrine, Hunt argues that the government failed to establish that it was inevitable that an inventory search would occur, since the Department's Policy makes it a discretionary decision as to whether to tow or impound a vehicle. Specifically, he contrasts the discretionary policy here, which states that "[a] vehicle *may* . . . be towed or impounded . . . . [i]f the operator is arrested" (gov. ex. 5 [60-2], §II(A)(2)(5)(c) (emphasis added)),[11] with the policy at issue in Mendez, which r*equired* the vehicle to be towed and inventoried. Hunt's Post-Hearing Brief [66], pp. 19-20, *quoting* Mendez, 315 F.2d at 136 ("[t]he written policy of the Hartford Police Department required . . . the car towed and impounded . . . the unwritten policy and practice of the Hartford Police Department required . . . an inventory search of the car"). Hunt also notes that the government presented "no evidence . . . which would call into question [the female passengers] ability to legally drive [Hunt's] car away from the scene". Id., p. 20; Hunt's Reply [68], p. 5.

According to the government, Hunt's vehicle "had to be towed and inventoried", since it "could not be legally released to" the passengers in Hunt's vehicle. Government's Post-Hearing Memorandum of Law [67], p. 12. In support of that argument, the government relies on United States v. Clinton, 591 F.3d 968 (7th Cir. 2010). However, in Clinton, unlike here, both occupants of the vehicle were arrested, "*leaving no one to drive the car*". 591 F.3d at 972 (emphasis added). As Hunt notes, the government offers no other "factual or legal support" for its argument. Hunt's Reply [68], p. 5. Without more, I am unable to conclude that the

---

[11]   The Department Policy states that if a vehicle is towed or impounded, the contents of such vehicles "are subject to inventory". Gov. ex. 5 [60-2], §III(B)(1).

government has satisfied its burden of demonstrating with a high degree of confidence that an inventory search would inevitably have been conducted.

## CONCLUSION

For these reasons, I recommend that Hunt's supplemental motion to suppress (Anzalone Affirmation [41], §VII) be granted. Unless otherwise ordered by District Judge Elizabeth A. Wolford any objections to this Report and Recommendation must be filed with the clerk of this court by December 2, 2019.  Any requests for extension of this deadline must be made to Judge Wolford.  A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985). Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 59(c)(2) of this Court's Local Rules of Criminal Procedure, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority", and pursuant to Local Rule 59(c)(3), the objections must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or  identifying the new arguments and explaining why they were not

-14-

raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objection.

Dated: November 18, 2019

/s/ Jeremiah J. McCarthy<br>
JEREMIAH J. MCCARTHY<br>
United States Magistrate Judge